## AALHOLM *v.* A CARGO OF IRON ORE.[1]

*(District Court, S. D. New York.    March 22, 1885.)*

1. DEMURRAGE—EXCEPTIONS IN CHARTER—"FROST."

The charter of the bark E. from Carthagena to New York provided that she should take on board " say 600 tons of iron ore, to be loaded and discharged at the rate of 70 tons per  *   *   *   day;" the cargo "to be received and delivered as customary," and "to be delivered as directed by the consignees," the charterers to have "the option of averaging the days for loading and discharging," etc., "lay days to commence at six o'clock in the morning, after the ship is reported, and all ready to load or discharge;" and among the exceptions to demurrage charges was hindrance from "frost." The claimants first directed the ship to Jersey City, but on the captain's objecting, they agreed that she might go to Atlantic docks, Brooklyn, and there discharge in lighters. While there, the weather became very cold, and the accumulated ice delayed the discharge by making it difficult for the lighters to be shifted in order to trim the cargo, and this libel was filed for eight days' demurrage in consequence. Two of the days were lost at Carthagena. *Held*, that the wedging in of the lighters by the ice, and the consequent delay in discharge, was a result of "frost," such as to bring the delay under that exception in the charter-party.

1Reported by R. D. & Edward Benedict, Esqs., of the New York bar.

2. SAME—"CUSTOMARY" MODE OF UNLOADING.

 The libelants claimed that the cargo might have been trimmed faster by employing men with wheelbarrows, instead of trusting to moving the lighters. It appeared that this method was employed when the lighters became actually frozen in, and it was applied with reasonable diligence. *Held,* that such was not the "customary" mode of unloading and trimming in lighters; that the "customary" mode being all that this charter-party required, extraordinary diligence was not obligatory on the charterer to avoid the consequences of the "frost," which was excepted.

3. SAME—COMMENCEMENT OF LAY DAYS.

 The charter-party provided that lay days should commence from 6 o'clock of the morning, after the vessel was ready to discharge. *Held,* that the time could be counted only from the time of the ship's actual readiness to begin the discharge, either upon the wharf or into lighters, whichever was agreed upon, both modes of discharge being in use. As she never got a berth at a wharf, and as a discharge in lighters was the mode agreed on, it was immaterial whether, under the actual circumstances, she could have discharged sooner or not, by going to a berth along-side a wharf, the captain having made no objection to a discharge in lighters, or to the place adopted.

4. SAME—TWO DAYS' DEMURRAGE.

 As no excuse was offered for the two days' delay at Carthagena, and the time was not made up at the end of the voyage, *held,* that the ship should be charged for two days' demurrage.

In Admiralty.

This libel was filed to recover demurrage for the detention of the Norwegian bark Emigrant, in the loading and discharge of a cargo of iron ore, under a charter of that vessel from Carthagena, Spain, to New York. The charter provided that she should take on board "say about 600 tons of iron ore, to be loaded and discharged at the rate of 70 tons per weather working day of 24 hours, Sundays and holidays excepted;" the cargo "to be received and delivered in turn, as customary, at the ports of lading and discharge," and "delivered as directed by the consignees," the charterers to have "the option of averaging the days for loading and discharging, in order to avoid demurrage;" "lay days to commence at six o'clock in the morning, after the ship is reported and all ready to load or discharge, of which the captain is to give notice in writing to the shippers and consignees;" "demurrage over and above the said lay days, £8 per day of 24 hours, except in case of any hands striking work, frosts or floods, revolutions or wars, or any unavoidable accidents which may hinder the loading or discharge." The number of lay days was not specified.

The vessel took on board at Carthagena 560 tons of ore, occupying 10 weather working days, and arrived with it at New York on the twenty-second of January, 1881. After being first directed to go to Jersey City, to which objection was made by the captain, she was directed to Atlantic docks, Brooklyn, to be discharged in lighters. The discharge was commenced on the twenty-seventh of January, as soon as the bark was ready, but was not completed until the eleventh of February. Two days' time having been lost at Carthagena, the libelants claimed that but six remained available to the claimants, leaving eight days' detention, for which demurrage was claimed.

 *Butler, Stillman & Hubbard & Mynderse,* for libelants.

*Jas. K. Hill, Wing & Shoudy,* for claimant.

BROWN, J. The claimants, by their charter-party, had a right to direct the ship to her place of discharge. They first directed her to a dock at Jersey City. The captain objected to going there, reporting to the claimants that on inquiry he had been told that there was not sufficient water at the dock assigned. The evidence as to the actual depth of water there is, however, inconclusive and unsatisfactory. Had the unloading taken place at the dock at Jersey City, the discharge would have been made into cars rapidly and without interruption. The ship was at that time just outside of the Atlantic docks, Brooklyn. Upon this objection of the captain, the claimants told him that he might go into Atlantic docks, and that they would discharge on lighters there. The captain, accordingly, moved inside the docks, but did not get a berth along-side any wharf; and the claimants had lighters in readiness, before the ship was prepared with proper appliances, or "ready to discharge." There was some ice inside the Atlantic docks when the ship moved in; but no objection was made to this dock on that account, nor does the libel claim that the assignment to these docks was, under the circumstances, improper. The continued and increasing cold caused such an accumulation and freezing up of the loose ice within the docks that the necessary changes in the position of the lighters in order to receive the ore could not be made without numerous delays. The actual discharge commenced on the twenty-seventh of January, and was not completed until the eleventh of February, occupying 14 working days. The stipulated rate of 70 tons per day would have occupied but 8 days. I am satisfied from the evidence that the entire detention was caused through ice from increasing and continued cold weather, after the ship had taken up her position within the docks, and after the lighters were along-side. There was no delay in bringing the lighters along-side from first to last.

The customary mode of discharging iron ore in New York is either upon the dock or upon lighters. When discharged in lighters, the usual practice is to move the lighter along from time to time beneath the place where the ore is dumped. The difficulty here was that the lighters were so wedged in by the ice that great delays were caused, first, in the shifting of the lighters, in order to trim the cargo properly, and, afterwards, in trying to trim the cargo without shifting. The libelants claim that the cargo might have been trimmed faster by employing men with wheelbarrows to trim the cargo by wheeling it fore and aft, instead of moving the lighter. But that was, at best, a slow mode of loading; and it was very speedily adopted when the lighters became frozen in, and it was applied with reasonable diligence. That was not, however, the customary mode of unloading into lighters; and the "customary" mode of unloading was all that this charter-party required. In *Tapscott* v. *Balfour* (L. R. 8 C. P. 46, 53) it was held that these words refer specially to the *mode* rather than to the time of unlading; while in *Postlethwaite* v. *Freeland* (5 App. Cas. 599) the words

"all dispatch according to the custom of the port" were held to put the ship to all the risks of the customary disabilities and detentions of the port through lack of lighters procurable by the charterers.

If, in the present case, the detention by ice in handling the lighters during the process of unloading was a detention by "frost" "hindering the discharge," within the meaning of these words in the charter-party, then the detention in this case is within the exception of the charter, and the defendants are not liable unless the detention could have been avoided by ordinary and reasonable diligence. The evidence satisfies me that from the first all the usual men were employed, and ordinary diligence was used, for trimming the cargo and for changing the lighters; and that, when it became apparent that more men were needed to trim the cargo, ordinary diligence was used in getting additional men with wheelbarrows for that purpose. Extraordinary diligence and efforts to this end certainly are not obligatory on a charterer in order to avoid the consequences of the very cause that is contemplated and provided for in the exception. The requirement to discharge 70 tons per day was subject to this exception of "frost."

I see no reason to doubt that the obstruction in moving the lighter caused by ice, as the result of "frost," is within the meaning of this exception of the charter-party. Frost here means freezing; and it includes any freezing that would hinder or obstruct the loading or unloading of the ship. This is the most natural, if not the only, meaning that the word "frost" could have in this connection. In the cases of *Kay* v. *Field,* 8 Q. B. Div. 594, and 10 Q. B. Div. 241, and *Coverdale* v. *Grant,* 8 Q. B. Div. 600, and 9 App. Cas. 470, both of which were elaborately considered, no question was made that an impediment through ice was within the meaning of the exception of "frost" in the charter-party. But it was held that it did not apply to impediments by ice in transporting the goods from some other place to the place of loading; but only to such impediments existing at the very place of loading or unloading. Such is precisely this case. *Hudson* v. *Ede,* L. R. 2 Q. B. 566 and L. R. 3 Q. B. 412; *The Norman,* 16 Fed. Rep. 879.

The charter-party in this case provided that the time was to be counted only from 6 o'clock of the morning next after the vessel "is reported and all ready to load or discharge, of which the captain is to give notice to the consignees." This manifestly means a present readiness to commence the actual discharge. No time can be counted, therefore, as lay days, except from the time of the ship's actual readiness to begin the discharge, either upon the wharf or upon lighters. *Carsanego* v. *Wheeler,* 16 Fed. Rep. 248; *Teilman* v. *Plock,* 17 Fed. Rep. 268, and 21 Fed. Rep. 349; *Murphy* v. *Coffin,* 12 Q. B. Div. 87. The ship accepted the proposed discharge upon lighters as the mode of discharge in this case. She never got a berth along-side a wharf where she was ready to discharge in any different manner. The exceptions of the charter-party must, therefore, be applied to the

mode of discharge agreed upon and followed by the parties.  *Gronstadt* v. *Withoff*, 21 FED. REP. 253, 255.  No question arises as to what delays might have been experienced in attempting to unload at a berth along-side the wharf; for the ship never got a berth, nor attempted to get one.  There is no reason to suppose, however, that she could have obtained a discharging berth instantly.  The disadvantage to the ship, by that mode of discharge, might have been equally great, since, by the terms of this charter, the lay days would begin only from the time of actual readiness to discharge at the berth.  Cases *supra;* and see *Robertson* v. *Jackson,* 2 C. B. 412; *Leidemann* v. *Schultz,* 14 C. B. 38; *Lawson* v. *Burness,* 1 Hurl. & C. 396; *Kell* v. *Anderson,* 10 Mees. & W. 498.

No evidence being offered to excuse the two days' delay at Carthagena, and the lost time not being made up through any more rapid discharge here, so as to fall within the average clause of the charter, the libelants are entitled to a decree for two days' demurrage, and to that only, amounting to £16, with interest and costs.